ALFRED R. WARNER, Respondent, *v.* VICTORIA L. LUCEY and Another, Individually and as Administrators, etc., of JAMES LUCEY, Deceased, and Others, Appellants.

Third Department, November 15, 1923.

Landlord and tenant — action to recover damages for injuries suffered by plaintiff when freight elevator in public garage fell — elevator was used beyond capacity with knowledge of lessors — lessors knew that elevator was unfit for use intended — both lessors and lessees are liable — covenant to repair does not relieve lessors from liability.

Both the lessors and the lessees of a public garage are liable for the injuries suffered by the plaintiff when a freight elevator in the garage fell, where it appears that the lessors had knowledge at the time the lease was made that the elevator was unfit for the purpose of carrying automobiles weighing more than 4,000 pounds, that they knew its capacity and condition and had been warned of its insufficiency and the lessees either knew of the unsafe condition and defects in the elevator or should have known of them, and that the accident in question

16

occurred while an automobile weighing about 4,300 pounds was being lowered from an upper floor to the main floor of the garage.

A covenant in the lease which required the lessees to keep the premises in repair does not relieve the lessors from liability to a third person for a defect which existed when the lease was made.

HASBROUCK, J., dissents; HINMAN, J., dissents in part, with opinion.

APPEAL by the defendants, Victoria L. Lucey and another, individually and as administrators, etc., from a judgment in favor of plaintiff, entered in the office of the clerk of the county of Schenectady on the 10th day of June, 1922, upon the verdict of a jury, and also from an order entered in said clerk's office denying defendants' motion for a new trial made upon the minutes.

The defendants Lucey are the owners and lessors of a building in the city of Troy used as a garage. The complaint was dismissed as to the defendants Lucey in their capacity as administrators. The defendants Dreher and Richter leased from the defendants Lucey this garage on or about the 1st day of May, 1921, covenanting to keep the premises in repair during the term. The accident happened May 17, 1921. The plaintiff, with Stedman, the owner of a Cadillac car, which weighed 4,300 or 4,400 pounds, went to this garage to get the car, which had been stored for the evening upon an upper floor. The car was placed on the elevator and run down. When they reached the ground floor the elevator settled from six to eight inches below the floor. Stedman was sitting in the car; the plaintiff was standing on the floor of the elevator. The man operating the elevator went into the basement, returned and attempted to raise the elevator even with the floor. Whether or not he succeeded, the elevator sagged again. The operator attempted to control the elevator, but it started to descend slowly at first, and then with greater rapidity, to the bottom of the elevator pit, some eighteen feet below the ground floor. The plaintiff was injured, either by being thrown or by jumping from the elevator into the basement. There were no doors attached to the elevator. This building had been leased for a garage for a number of years. One Campbell was the lessee prior to May 1, 1921. He testified that he told Lucey in January, 1921, that the elevator was not fit for the use for which it was intended, with the increased weight of cars, and that he showed Lucey a letter from the State inspector pointing out repairs that must be made to the elevator. The carrying capacity of the elevator was 4,000 pounds. Many automobiles weigh more than 4,000 pounds. This elevator was repaired in 1914 or 1915 by Mr. Irwin, a competent man. He made repairs and improvements, which at that time rendered the elevator a suitable and sufficient vehicle up to its capacity of 4,000 pounds, but not more. This was done with the knowledge

and consent of the lessors.   The elevator cage at that time was suspended by two cables, the hanging being in the center of the top of the cage.   He extended one side of the floor of the cage two feet, leaving the hanging, however, as it was.   This was done to permit "longer and heavier cars" to be carried and because the lessors wanted "a general garage business conducted in that building." Carrying a car heavier than 4,000 pounds threw the cage out of balance, caused it to bind in the guides, thus subjecting it to a constant overstrain.   This constant overstrain loosened the guides and overtested the parts of the elevator.   The structural parts of the elevator were not again changed or strengthened until the time of the accident.   Mr. Irwin testified that in his opinion the elevator fell because it was not of sufficient carrying capacity to support an automobile weighing 4,300 pounds, together with two or three men.   The witness Dodge testified that, at the time of the accident, he heard something give way in the mechanism and "down the elevator went;" it was a creaking noise.

*Ainsworth, Carlisle, Sullivan & Archibald* [*Benjamin P. Wheat* of counsel], for the appellants.

*Judge & Lyons* [*John E. Judge* of counsel], for the respondent.

VAN KIRK, J.:

The case was tried as a negligence action and submitted to the jury on the theory that the elevator was not of sufficient strength and carrying capacity to answer the purposes intended, namely, to be used in a public garage for storage of cars, of the usual weights, on upper floors reached by the elevator.   The jury was justified in finding upon the evidence that, when the lease was made, the elevator, to the knowledge of the defendants Lucey, was unfit for the use intended; that they knew its capacity and condition and had been warned of its insufficiency, but they, without making any changes therein, made the lease to the defendants Dreher and Richter; that, while there was evidence tending to show that there was a loose brake shoe and a broken safety device, these defects were the natural consequence of overstraining the elevator and would not have developed and caused the elevator to fall had it been of sufficient carrying capacity and fit for the use intended; that the constant overloading of the car would cause a belt to slip, a brake band to loosen or the supporting cables to break under circumstances such as would not have caused either of such defects if the elevator itself had been of sufficient capacity; that the elevator fell and the injuries were received by plaintiff because of its insufficiency and unfitness.   The garage was intended by the lessors and tenants for public patronage, to be used by any one who applied

and paid for the storage of his car, whether of the lighter or heavier weight. It was a public use or place, as is an inn or warehouse. From this use both parties derived a profit; the lessors through the rent reserved. This plaintiff was in the position of a patron properly on the premises; he was lawfully there.

The lessees are liable for unsafe conditions or defects known to them, or which ought to have been known to them, while they occupied the leased premises. The lessors are liable for the consequences of the unfitness and insufficiency of the elevator when put to the uses they intended, a condition which to their knowledge existed when the lease was made, and for which use they received stipulated rentals. (*Swords* v. *Edgar*, 59 N. Y. 28; *Barrett* v. *Lake Ontario Beach Imp. Co.*, 174 id. 310.) A covenant by a lessee to keep the premises in repair does not relieve a lessor of liability to a third party for a defect which existed when the lease was made. (*Swords* v. *Edgar, supra,* 36, 37.) In the *Barrett Case* (*supra,* 314) the court said: " If the premises are rented for a public use for which he [the lessor] knows that they are unfit and dangerous, he is guilty of negligence and may become responsible to persons suffering injury, while rightfully using them. Such instances would be where he lets a warehouse, so imperfectly constructed that the floors will not support the weight necessarily upon them; or where he lets a building for public amusements, or exhibitions, or other public purposes, and its construction is so unsafe, structurally, as to be the cause of injury to any one." The law and the evidence justified the verdict.

There are a number of exceptions which the appellants urge as grounds for reversal. The record is long and the case was difficult for both the attorneys and the court. We have examined each of the exceptions urged and have read carefully the charge of the court and its rulings and explanations in answer to the appellants' requests to charge. We think the case was fairly submitted to the jury and that the real question upon which liability rests was prominently and clearly presented to them; and have concluded that there are no errors in the rulings of the trial court, not corrected, which affect a substantial right of the appellants. (Civ. Prac. Act, § 106.) In our view the result of the trial is fair and just.

It is not claimed that the amount of the verdict is excessive.

The judgment and order should, therefore, be affirmed, with costs.

CO CHRANE, P. J., and MCCANN, J., concur; HINMAN, J., dissents in part with an opinion; HASBROUCK, J., dissents on the ground that Roulier, who operated the elevator upon this occasion, was a volunteer.

HINMAN, J. (dissenting in part):

It seems to me that no case was made out against the defendants Lucey. Assuming that the Luceys as landlords could be held responsible if there was proof of negligence on their part proximately causing or helping to cause the accident, I fail to find any proof in the case which shows that the landlords were guilty of any such negligence. The testimony does not show just how the accident occurred. There are several theories as to how it might have occurred, but to hold the landlords responsible it is necessary to find some proof tending to show that the accident occurred in a way for which the landlord was proximately responsible. The plaintiff has failed to meet the burden of proof against the defendants Lucey in that respect. So far as the tenants are concerned the doctrine of *res ipsa loquitur* could apply, but that doctrine cannot apply to a landlord who is not in possession and control of the premises at the time. The theory of that doctrine is that the person in control is presumed to be in a position to explain. In the case of *Francey* v. *Rutland R. R. Co.* (222 N. Y. 482, 484) the Court of Appeals explained the doctrine of *res ipsa loquitur* and stated the rule as follows: " ' When the thing causing the injury is shown to be under the control of a defendant, and the accident is such as, in the ordinary course of business, does not happen if reasonable care is used it does, in the absence of explanation by the defendant, afford sufficient evidence that the accident arose from want of care on its part.' " The premises were not under the control of the defendants Lucey at the time and the accident might well have happened, according to the proof, by reason of the negligent maintenance or operation of the elevator by the tenants. According to the testimony it is just as probable that the accident happened by reason of such maintenance or operation as that the elevator was knowingly left in an improper condition by the landlords for the use intended when they leased the premises. " When the fact is that the damages claimed in an action were occasioned by one of two causes, for one of which the defendant is responsible and for the other of which it is not responsible, the plaintiff must fail if his evidence does not show that the damage was produced by the former cause. And he must fail also if it is just as probable that they were caused by the one as by the other, as the plaintiff is bound to make out his case by the preponderance of evidence." (*Searles* v. *Manhattan R. Co.,* 101 N. Y. 661; *Ruppert* v. *Brooklyn Heights R. R. Co.,* 154 id. 90, 94; *Lopez* v. *Campbell,* 163 id. 340, 347; 2 Thomas Neg. [2d ed.] 1115.)

Assuming that a fair inference might be drawn from the testimony to the effect that the owners of the building leased it with

knowledge, actual or constructive, that it was in a defective and unsafe condition for the use intended, it was necessary for the plaintiff to show that such defects were the proximate cause of the accident and the court so charged. The question is whether the evidence fairly and reasonably excludes any other hypothesis. The evidence presented to the jury under the theory of the plaintiff's case did not definitely purport to fix the cause of the accident. One theory was that the elevator had not been built to guarantee the carriage of such a heavy car as this one was and that the overloading of the elevator over a long period of time without structural changes had weakened certain parts of the elevator and warped its frame somewhat. It was claimed that it had weakened the guides erected at the sides of the elevator which were used to steady the movements of the elevator in the well and prevent it from striking obstructions and also to furnish means for the operation of certain safety clamps intended to operate upon these guides as a brake in the event that the cables of the elevator should break. There was some evidence on the part of the plaintiff that a single cable broke which was spliced the following morning. It was the undisputed proof, however, of one of the plaintiff's own expert witnesses that the elevator would not fall unless both of the lifting cables broke; that the elevator might coast or run down to the bottom if something happened to the brake or a fuse burned out destroying the power, or the belts were not properly shifted to the driving pulleys. This witness also said that the safety clamps operating on the guide posts would not operate unless both of the lifting cables broke. There was further evidence by another expert witness for the plaintiff that he examined these guide posts after the accident and found no evidence that these clamps had operated at the time of the accident. He says that the guide posts did not give evidence of having been chewed or scraped by the operation of these clamps. There was no occasion for their operation because only one of the lifting cables broke. There is further proof to sustain the theory that the cables did not break letting the car drop to the bottom of the elevator well. The plaintiff's own expert says that unless both cables broke, the car would in case of some other defect simply coast or run down to the bottom with increasing momentum. Apparently the latter is just what happened according to the plaintiff's own testimony and that of his witnesses. The plaintiff says that when it slipped the first time it " just eased down, just sagged down for eight or ten inches." And he says, speaking of the second time when it went two feet below the floor: " I have no recollection of it having gained any great momentum. I think it went down fairly easy." Stedman, the owner of the automobile,

says it " sagged " the first time and that it " sagged " again the second time and that the third time when it went to the bottom of the pit, " first it moved very slowly and then got up quite a lot of momentum for a short distance." Moreover the attorney for the plaintiff stated during the course of the trial that there was no evidence that a broken cable caused the accident. We must look for proof of the cause of the accident elsewhere than the breaking of a cable.

It was the theory of the plaintiff that a belt had slipped off and that the operator of the elevator went to the basement where he stayed ten or fifteen minutes and then returned and after manipulating the cable the second time succeeded in raising the elevator slightly above the level of the main floor; that the elevator then sagged a distance of two feet below the floor and after standing there for a few seconds or a few minutes, it went to the bottom first slowly and then with increasing momentum going a distance of about eighteen feet. Campbell, the former tenant and who was a witness for the plaintiff, testified that the pulling of the hand cable in operating the elevator had a twofold effect. It operated to release the brake and to shift a belt to an operating pulley. He says: " You can release the brake without getting a full grip on the pulley with the belt." He also says that if you do not get your. belt on, " the elevator will fall." Irwin, the plaintiff's expert, also says that in operating a hand cable you can loosen the brake without getting the belt clear on. " You could get your belt over just a part of the way * * * a very small part of the way." He says there should be a lock nut on a bolt used to keep a spring adjustment on the brakes in proper position; that if you do not have this lock nut the spring will not hold in position and the brake will work loose; that the braking device if properly set for the load to be carried and kept set was a proper device but that if the nut comes loose the brake will not work properly and the car will run away. The plaintiff's witness McDougall, also an expert on elevators, was sent to the garage a couple of days after the accident to examine it and he found that " there had been several full turns of the adjustment nut taken on the brake band bolt that answered the purpose of tightening the band on the pulley, the brake pulley," and he said that he could tell " by looking at those turns " that the turns had been made " immediately prior " to his getting there — " a very recent time " prior to his inspection. The defendants' witnesses also explained the operation of the elevator and agreed with the plaintiff's experts that if the operator shifts the hand cable but not far enough to draw the belt upon the operating pulley, the brakes would be released; and lacking the power to overcome

the load on the elevator, the elevator would go down with increasing speed as it gathered momentum. The defendants' experts also explained the operation of the brakes and agreed with the plaintiff's experts that if the adjustment nut was loosened the car would settle and run down. The defendants' expert said that if the elevator settled eight or ten inches after a stop it could only be due to the brake not holding or to not being fully applied; that if it then started toward the bottom that would show that the brake had been released and that the driving belt was not sufficiently thrown onto the driving pulley to control the action of the machine and that the load had " overhauled the machine and run down."

Thus we have a distinct theory of the plaintiff borne out by the testimony of the defendants' experts and as fair and reasonable a theory as was presented by the case that this elevator could have settled and finally run to the bottom because the operator had not sufficiently thrown the belt upon the driving pulley and that the elevator was thus inefficiently supported by the machinery which ran it, and it settled back upon insufficient brakes which were rendered insufficient either because of their partial release by the operator or a lack of proper adjustment of the spring upon the brake, or both. There was some testimony that a plate in another safety device was found broken after the accident, but under the testimony there was a lack of proof that the breaking of this plate could have caused the accident. There was uniformity of proof that this break could be accounted for by the falling of the elevator as the result of the accident and not as one of the causes. The plaintiff's own expert testified that if the car coasted down and struck the foot of the shaft quite often that would break this safety device.

Since it is just as probable that the damages were caused by improper brake adjustment or the improper operation of the elevator, for neither of which the defendant owners could be held liable, as that the damages would not have occurred if the elevator had been of sufficient carrying capacity and fit for the use intended, the jury should not have been permitted to speculate upon this question so far as the defendant owners were concerned.

I vote for a reversal and for a new trial so far as the judgment against the defendants Lucey is concerned. Otherwise, I concur in the affirmance.

Judgment and order affirmed, with costs.