MARY FORTIER *vs.* THE HIBERNIAN BUILDING ASSOCIATION OF BOSTON HIGHLANDS.

Suffolk.    March 3, 1942. — February 2, 1944.

Present: FIELD, C.J., DONAHUE, QUA, & RONAN, JJ.

*Negligence,* Invited person, Licensor, One owning or controlling real estate, Turbulent persons.

Evidence that, for a consideration, the owner of a building licensed an association to use for a banquet two halls therein and also, in common with others, an adjacent lobby under the control of the owner warranted a finding that a woman waiting in the lobby to attend the banquet after purchasing a ticket therefor from the association was an invitee of the owner.

A finding of negligence of the owner of a building toward an invitee who, while standing in a lobby waiting to attend a banquet, was struck and injured by a crowd of turbulent boys was warranted by evidence that the boys had been acting in that manner in and near the lobby for at least an hour before the invitee was injured, of similar conduct of boys whenever there had been banquets in the building during several years previously, and that, although the superintendent of the building had been employed in the building during such years and had ample opportunity to know of the danger to persons in the building due to the conduct of the boys on the occasion when the plaintiff was injured, he did nothing to prevent it.

TORT. Writ in the Superior Court dated August 27, 1938.

The action was tried before *Buttrick,* J.

*M. K. Campbell,* (*J. A. Kline* with him,) for the plaintiff.

*J. T. Hargraves,* for the defendant.

DONAHUE, J. The defendant corporation owned a four-story building containing offices and also halls which, for a consideration paid, it allowed to be used for meetings of various organizations and for banquets and dancing parties. The plaintiff, who was fifty-three years old, came to the

defendant's building one evening to attend a banquet of the County Fermanagh Association, hereinafter to be referred to as the association. The banquet was to be served by a caterer employed by the association, in halls on the first floor of the defendant's building. The plaintiff had purchased a ticket from the association which entitled her to attend the banquet. She seeks to recover damages from the defendant for injuries received by her when a group of boys running through the lobby on the first floor of the defendant's building struck and injured her.

At the close of the evidence introduced by the plaintiff the trial judge directed a verdict for the defendant and reported the case to this court on the agreement of the parties that if the direction of the verdict was correct it should stand, but if the judge erred a finding should be entered for the plaintiff in the amount of $2,500.

Pertinent evidence is here summarized.

1. The defendant, for a consideration, licensed the association to use, on the evening when the plaintiff was injured, two banquet halls on the first floor of the defendant's building, and also to use, in common with other persons rightfully there, the lobby on the first floor. Control of the lobby was retained by the defendant. Findings were warranted that at the time of the plaintiff's injury the lobby was being used for a public or semipublic purpose; that the plaintiff was within the class of persons whose presence there was contemplated by the defendant; and that the plaintiff was a business visitor with respect to the defendant since she was there in the right of the association for a purpose for which the defendant was paid. The defendant on these findings owed to the plaintiff the duty to use reasonable care to put and keep the lobby of the building in a reasonably safe condition for the purpose for which it was to be used. *Shrigley* v. *Boston Symphony Orchestra, Inc.* 287 Mass. 300, 302. *Colbert* v. *Ricker*, 314 Mass. 138, 140, and cases cited.

2. The plaintiff arrived at the defendant's building on the evening of her injury shortly after seven o'clock. While waiting in the vestibule for a friend for ten or fifteen minutes, she saw a group of boys — who later injured her — twice

run out of the building and twice run back again. They appeared to be fourteen or fifteen years old. They were dressed in overalls. Two of them had newspapers under their arms. They were "running wild . . . like wild Indians, pushing each other." They were "pushing people upstairs and down." Later, when the plaintiff entered the lobby, she saw the same boys "coming down the stairs [from the second floor] again." She saw them "pushing and trying to get out and going by the other people that were standing; they were running at all times." Still later at about eight-thirty o'clock, while waiting in the lobby with others for the banquet hall doors to be opened, she saw the same boys come "running out" of one of the banquet halls. Although there was room for them to pass her safely they struck her, throwing her to the marble floor of the lobby and injuring her.

A man named Armstrong, a member of the banquet committee of the Fermanagh Association, arrived at the defendant's building on the evening in question between seven-thirty and eight o'clock. A few minutes after he arrived he saw a group of boys come "rushing in around the doors" and upstairs toward the superintendent's office on the second floor and then go down to the basement. Later he saw the same boys in the lobby, "coming along jostling against everybody, knocking anything that was in people's hands out of their hands." They went by him and tried to get into the banquet hall but he stopped them. The boys were on the premises going up and down stairs for thirty-five or forty minutes before he saw the plaintiff injured by them at about eight-thirty o'clock. Twenty minutes before the plaintiff was hurt, Armstrong made an effort to get someone to eject the boys. There was an electric bell, with a button outside the door of the superintendent's office on the second floor, which, when rung, could be heard anywhere in the entire building. Armstrong went to the bell and rang it. He waited awhile and rang it again. He rang it a third time but no one responded.

The defendant's superintendent testified that on the evening in question there were about two hundred persons

attending the banquet on the first floor and twelve hundred to fourteen hundred persons in the dance halls on the second, third and fourth floors of the building. It did not appear that any employee of the defendant, other than the superintendent, was in the building on the night when the plaintiff was injured. He testified that he was in the building from seven o'clock until after the plaintiff was hurt, but he did not "recall hearing the bell" when Armstrong rang it; that at the time of the plaintiff's injury he was in his office on the second floor; and that for half an hour prior to that time he was making "a routine survey of the building." Neither the plaintiff nor Armstrong, both of whom knew the superintendent, saw him that evening until after the plaintiff was injured.

The superintendent had held that position for about eighteen months before the evening when the plaintiff was injured and prior thereto was for three years assistant to a former superintendent. He testified that he saw no boys in the building on the night of the plaintiff's injury and that "he never saw any gangs" of boys there and "never had to put out any gangs of boys." But the witness Armstrong testified that for many years he was at the building about five nights a week, and that within a year preceding the night of the plaintiff's injury he had seen boys running around the building and acting as did the boys who were there on the night the plaintiff was injured. He had in the past made complaints as to this condition in the building and, upon receiving such complaints, the superintendent put such boys out of the building.

The plaintiff testified that she had attended many banquets at the defendant's building in the two years next preceding the night when she was injured. On such occasions she had always seen boys there, dressed in old clothes or overalls. At times they would be very rough. They would run up and down stairs and push their way through people who were standing in the lobby awaiting the opening of the doors to the banquet halls. They would try to get into the banquet halls, and at times they would gain entrance and would come running out with ice cream, cake and other edibles.

A witness who had been superintendent of the building up to eighteen months before the plaintiff's injury testified that, during his employment, boys in working clothes would enter the building, run through the corridors and disturb caterers and members of organizations hiring halls for banquets. Constant supervision was necessary to prevent such disturbances. Sometimes such boys would strike the witness and sometimes he would take them into court. Since the witness had ceased to be superintendent he had been at the building and observed no changes so far as the conduct of such boys on the defendant's premises was concerned.

3. The defendant was not an insurer of the plaintiff's safety while she was in its building. It, however, owed her the duty to keep its premises reasonably safe for her use while she was there. If a dangerous condition arose on the premises while the plaintiff was there, the law allowed a reasonable opportunity to the defendant's superintendent to learn of the danger and to take measures to remedy it. *White* v. *Mugar*, 280 Mass. 73, 75. *Keenan* v. *E. M. Loew's, Inc.* 302 Mass. 309, 312.

But, for an hour at least before the plaintiff was injured, the group of boys who finally caused her harm were running in and around the lobby on the first floor of the building and so conducting themselves as to constitute a potential danger to the plaintiff and other persons who were rightfully in the lobby.

The superintendent by looking from the hallways on any of the three upper stories of the building could see the entire lobby, and the ringing of the bell on the second floor could be heard by him if he was anywhere in the building. He did not hear the bell when it was rung nor did he, so far as appears, take advantage of the opportunity to view conditions in the lobby from any of the three upper floors of the building. A jury would not be obliged to accept his testimony that he made a "routine survey" of the building.

The defendant contends that the turbulent conduct of the boys in the lobby during the hour preceding the injury to the plaintiff was a "sporadic act" which could not reasonably have been foreseen by the superintendent. But

there was evidence that during the eighteen months when he was superintendent, and earlier, when he was for three years assistant superintendent, whenever there were banquets held in the building groups of boys would enter the lobby and run in and out of the building and act much the same as did the boys who injured the plaintiff.

The evidence warranted a finding by a jury that the superintendent did not use reasonable care to keep the lobby of the defendant's building in a safe condition for the purpose for which it was used by the plaintiff. *Shrigley* v. *Boston Symphony Orchestra, Inc.* 287 Mass. 300, 302, and cases cited. *McFadden* v. *Bancroft Hotel Corp.* 313 Mass. 56, 59, 60. *Colbert* v. *Ricker,* 314 Mass. 138, 139–140. Am. Law Inst. Restatement: Torts, § 348.

*Judgment for the plaintiff.*